UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES,

    Plaintiff,

v.

                              Case No. 23-20045
                              Hon. Denise Page Hood

WILLIAM MCGEE,

    Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS
[ECF NO. 13]
AND
DEFENDANT'S MOTION TO SUPPRESS
[ECF NO. 21]**

    **I.**    **INTRODUCTION**

On June 13, 2023, and September 29, 2023, Defendant, William McGee, filed, pro se, a Motion to Dismiss and a Motion to Suppress, respectively. [ECF Nos. 13 and 21]. At the time of the filings, McGee was represented by counsel, Vincent Toussaint. Because the Court does not allow hybrid representation, the Court permitted Mr. Toussaint time to supplement the motions filed by McGee, to the extent he wished to do so. Before submitting supplemental briefing, Mr. Toussaint requested to withdraw from this representation due to health reasons and the Court granted his request. [ECF No. 29]. Thereafter, the Court appointed Charles O. Longstreet, II, who quickly withdrew due to a breakdown in the

attorney-client relationship. [ECF No. 30]. The Court, again, granted the request and appointed Nicole L. Smith to represent McGee. [ECF Nos. 31 and 32]. On April 30, 2024, Ms. Smith filed supplemental briefing on behalf of McGee as to the Motion to Dismiss and the Motion to Suppress. [ECF Nos. 34 and 35]. The Government filed timely responses to both motions. [ECF Nos. 36 and 37].

## II. BACKGROUND

McGee is charged in a one-count indictment for allegedly possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Detroit Police Department ("DPD") Officer, Steven Anouti, testified that on December 28, 2022, he was working in an undercover capacity near the area of Morang and Somerset. [ECF No. 41, PageID.229]. Officer Anouti was very familiar with the area because it was an area that he worked often. *Id*. Traveling westbound on Morang, Officer Anouti "observed a male walking eastbound on Morang" looking very observant, "like he was checking his surroundings as he was walking."[1] *Id*. at PageID.230. Officer Anouti also observed a bulge on the male's right side that was irregular with his body. *Id*. However, he was unable to slow down and stop to see what the bulge was. *Id*. Officer Anouti called Officer Borum on the phone and explained what he saw. *Id*. Officer Anouti could not recall if he gave Officer Borum a

---

[1] On cross examination, Officer Anouti explained that the male was checking shoulder to shoulder which was something he did not believe to be normal, despite the fact that the area may have been a high crime area. *Id*. at PageID.237.

description of the individual and did not include a description in his report and never actually saw a gun. *Id*. at PageID.238-39.

Upon receiving the information from Officer Anouti, Officers Wells and Borum located McGee and believed him to be the subject. [ECF No. 37, PageID.207]. Both Officers reported that McGee was wearing black pants, a blue hooded sweatshirt, and had a blue cloth hanging out of his pocket. *Id*.; see also PageID.211]. Officer Wells testified that at the time of the incident, he was a part of the Ninth Precinct's Special Operations Unit. [ECF No. 41, PageID.245]. He explained that he and Officer Borum were generally assigned to patrol the "high crime areas looking for people carrying guns." *Id*. When Officer Borum and Officer Wells saw McGee, Officer Wells rolled down the window and asked him if he had a gun and to lift his shirt up and show his waistband. *Id*. at PageID.247. McGee then put his phone in his pocket and began running. *Id*. at PageID.248.[2] Officer Wells pursued McGee on foot while Borum followed in the scout car. As the chase ensued, Officer Wells stated that he heard "metal striking metal" while he was running past a UPS van stopped at a red light and the driver yelled "he threw something in here." *Id*. at PageID.249. McGee was eventually stopped by the police and arrested. [ECF No. 37-1, PageID.207]. Once McGee was restrained,

---

[2] The report made by Officer Borum after the incident states that McGee turned slightly to the left to talk to Officer Wells and kept the right side of his body "bladed away" from the officers. [ECF No. 37-1, PageID.211].

3

Officer Wells went back to the UPS van and "recovered the purple and black Tausus G2c, s/n ADD211896, handgun from underneath the driver's seat." *Id*.

The Court admitted squad car and body-worn camera videos of the events into evidence as Government's Exhibits 1 and 2, respectively.[3] While the videos do not reveal the initial conversation between McGee and law enforcement, they do show McGee fleeing police. Officer Wells testified that he did not see McGee with a gun; however, the squad car video shows McGee reaching into his right side and lifting his arm as he passed by the UPS vehicle. [Gov't Exhibit 1, Squad Car Video].

McGee now seeks to dismiss the indictment under the Second Amendment to the United States Constitution or in the alternative suppress the firearm as fruit of an unlawful search.

### III. ANALYSIS

#### A. Motion to Dismiss

The Second Amendment provides, "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. However, this right is not

---

[3] See *Bell v. Korkis*, No. 2:19-CV-13565, 2024 WL 69807, at *4 (E.D. Mich. Jan. 5, 2024) ("Where, as here, there is video evidence of the events underlying Plaintiff's allegations, a court views the facts as depicted in the video.")

4

absolute. The Supreme Court has addressed the constitutionality of firearm regulations in three seminal cases: *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), *McDonald v. City of Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), and, most recently, *Bruen*. *United States v. Alvarado*, 95 F.4th 1047, 1051 (6th Cir. 2024). This Court has held that §922(g)(1)'s ban on felons possessing firearms is presumptively lawful under Sixth Circuit and Supreme Court jurisprudence. See *United States v. Blackwell-Esters*, No. 22-20287, 2023 WL 7093806, at *4 (E.D. Mich. Oct. 26, 2023); *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 81 (2022) (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons…") (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).

McGee advances the same arguments as those put forth in *United States v. Blackwell-Esters*, 2023 WL 7093806, *1 (E.D. Mich. Oct. 26, 2023). There, this Court held that the *Bruen* court does not mention that felons would come within "the people" that the Second Amendment protects, nor has the Supreme Court ever recognized the right of felons to use firearms." *United States v. Blackwell-Esters*, No. 22-20287, 2023 WL 7093806, at *4 (E.D. Mich. Oct. 26, 2023). Further, "[g]iven the binding effect of *Carey*, the Sixth Circuit precedent which has not

5

been disturbed [sic], this Court continues to follow *Heller* finding that §922(g)(1)'s ban on felons possessing firearms as presumptively lawful." *Id*. at *4.

McGee cites one outlier case from this district where a defendant made a successful §922(g)(1) challenge. See *United States v. Williams*, No. 23-CR-20201, 2024 WL 731932, (E.D. Mich. Feb. 22, 2024). There, the court relied on *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016) in holding that § 922(g)(1) was presumptively unconstitutional. However, the Tyler case considered the constitutionality of § 922(g)(4). The Williams case is an outlier and has yet to be reviewed by the Sixth Circuit. Nevertheless, the pending appeal is likely to be reversed as the Sixth Circuit has affirmed "[w]e unambiguously held in *United States v. Carey*, 602 F.3d 738, 741 (6 Cir. 2010), that felon in possession statutes do not violate the Second Amendment, and that remains the binding law in this circuit." *United States v. Vaughn*, 2023 WL 9789018, at *1 (6th Cir. Sept. 28, 2023) McGee has not provided any authority showing a shift by the Sixth Circuit away from the holdings in *Carey*, *Heller*, or *Bruen*. Therefore, McGee's motion to dismiss is DENIED without prejudice pending a decision of the Sixth Circuit on *Williams*.

**B. Motion to Suppress**

McGee also moves the Court to have the gun recovered by DPD suppressed because Officers Wells and Borum lacked probable cause or even reasonable suspicion to arrest him. [ECF No. 35, PageID.171]. The Fourth Amendment of the Constitution provides citizens the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure. However, the Fourth Amendment "allows temporary investigative detentions, known as *Terry* stops, so long as there is 'a reasonable suspicion supported by articulable facts that criminal activity may be afoot[.]'" *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). In the context of a *Terry* stop, there need only be "a moderate chance of finding evidence of wrongdoing[.]" *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370–71, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009).

Courts must consider the totality of the circumstances to determine whether there was a sufficient degree of suspicion. *McCallister*, 39 F.4th at 374. Uncommon or unique facts are not required to establish reasonable suspicion and "[e]ven entirely innocent behaviors may establish reasonable suspicion in some circumstances. *Id*. "[W]e take the facts together, framing an entire picture." *Id*. In sum, "we view the totality of the circumstances through an objective lens, asking whether there was a moderate chance, arising out of articulable facts and

inferences, that the person stopped was engaged in criminal activity…and was armed and dangerous." *Id*. at 375.

Seizure occurs when the police, 'by means of physical force or show of authority," terminate or restrain an individual's freedom of movement. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254, 127 S. Ct. 2400, 2405, 168 L. Ed. 2d 132 (2007)." The Sixth Circuit has determined that a reasonable suspicion analysis is unnecessary where the court finds that an individual discarded a firearm while running from the police. *United States v. Damitres Ward*, 756 F. App'x 560, 563 (6th Cir. 2018). Therefore, the protections of the Fourth Amendment do not attach until an individual actually submits to the will of an officer.

In *Ward*, police officers observed defendant and two friends standing outside a market and repeatedly entering and exiting a black SUV parked in front of the store. *Ward*, 756 F. App'x at 562. This surveillance went on for seven hours. *Id*. the police considered the location a high crime area. *Id*. The officers believed that the behavior was consistent with drug trafficking and decided to conduct a field interview. *Id*. The officers questioned the men for several minutes and conducted a

8

pat-down of one of the men. "When the police asked [the defendant] to come to them, he turned away, ran in the opposite direction, and threw a firearm into the air as he fled." *Id.* at 561. The Court found that Ward was not seized within the meaning of the Fourth Amendment when he abandoned the firearm because even though the officers may have attempted to show their authority by asking Ward to come over, he did not actually submit. *Id*. at 563-4. The court noted that "because the officers did not use any physical force to restrain Ward's liberty, the question is whether a reasonable person in Ward's shoes would have felt free to leave, and whether Ward actually submitted to the officers' show of authority." *Id*. at 564. However, "[b]ecause we find that Ward did not submit to the officers' show of authority, it is unnecessary to analyze whether a reasonable person would have felt free to leave." *Id*.

The same is true here. Officer Borum received information from Officer Anouti that there was "a male possibly concealing a handgun walking along Morang." [ECF No. 37-1, PageID.207]. Officers Borum and Wells located McGee, pulled over, and asked him if he had a gun and if he could pull up his shirt and show his waistband. [ECF No. 41, PageID.247]. Officer Wells testified that McGee "just kind of looked at [Wells]," placed his phone in his pocket, and started running. *Id*. at 248. Officer Wells' body-worn camera shows McGee running in the opposite direction almost as soon as the officers pulled over. See Gov't Exhibit 2,

9

Body-Worn Camera Video. Even if the Court considered the officers pulling over and asking McGee whether or not he had a firearm a show of authority, the testimony and video confirm that McGee immediately failed to submit to such a showing. *Id*. The scout car video revealed that McGee reached into his right side and lifted his arm as he ran past the UPS vehicle. Gov't Exhibit 1. McGee was not detained until minutes after the abandonment of the firearm into the UPS vehicle.

Following the chase, Officer Wells returned to the UPS van and interviewed the driver. The driver can be overheard explaining that McGee "ran around the blue Equinox and as he was running by, he threw the gun right in there." Gov't Exhibit 2. The driver's statement coupled with the gesture made by McGee as he ran past the UPS vehicle plus Officer Wells' report and testimony that he heard a loud sound like metal striking metal support the Government's theory that McGee abandoned the purple and black Taurus, 9mm handgun, model G2C, Serial number ADD211896 recovered by Officer Wells. [ECF No. 37, PageID.191-92].

As in *Ward*, the officers' pursuit of McGee could only be considered attempted seizure because McGee failed to submit to the authority of the officers. The officers did not surround McGee, restricting his ability to leave, nor did they present their weapons. The officers merely pulled up about 20 feet away in a vehicle and asked McGee a question. Even if the officers did try to assert authority, McGee failed to submit by running away. At that point, McGee forfeited any

10

Fourth Amendment protections until he was actually seized. Since he discarded the gun prior to the attachment of Fourth Amendment protections, the firearm is not fruit of the poisonous tree. McGee's motion to suppress is DENIED.

Even if, the Court had to consider whether the officers had the requisite reasonable suspicion to stop McGee, the result would be the same. McGee attempts to downplay the facts supporting the officer's attempted investigative stop. McGee states "[t]he Officers responded to an alleged telephone call by and [*sic*] undercover officer who saw a blue rag hanging out of an individual's pocket and therefore had a 'hunch' that he was carrying a firearm." [ECF No. 35, PageID.174]. But that is not the full story. McGee was in a high crime area, was observed making furtive movements as he walked down the street, and there was a bulge on his right side which Officer Anouti believed to be a gun. These facts, together, could indicated that criminal activity was impending. Therefore, Officers Borum and Wells had enough to stop McGee and at least question him. That is what they attempted to do when McGee took flight. Therefore, denial of McGee's motion is appropriate.

## IV. ORDER

In light of the foregoing,

IT IS SO ORDERED that Defendant's Motion to Dismiss [ECF No. 13] is DENIED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendant's Motion to Suppress Evidence [ECF No. 21] is DENIED.

SO ORDERED.

s/ Denise Page Hood<br>
Denise Page Hood<br>
United States District Judge

Dated: July 18, 2024

I hereby certify that a copy of the foregoing document was served upon counsel of record or party on July 18, 2024, by electronic and/or ordinary mail.